```
                   UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF INDIANA
                         HAMMOND DIVISION


JEROME G. EASON,                )
                                )
           Plaintiff            )
                                )
      v.                        )   Case No. 2:06 cv 359
                                )
MICHAEL J. ASTRUE,              )
Commissioner of Social Security )
                                )
           Defendant            )
```

OPINION AND ORDER

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the plaintiff, Jerome Eason, on April 20, 2007. For the reasons set forth below, the decision of the Commissioner is **AFFIRMED**.

Background

The plaintiff, Jerome Eason, initially applied for Supplemental Security Income and Disability Insurance Benefits on December 11, 2003, alleging a disability onset date of July 1, 2003. (Tr. 55, 367) The claim was denied initially on June 8, 2004, and upon reconsideration on November 28, 2004. (Tr. 39, 370, 45, 377) Eason requested a hearing before an Administrative Law Judge ("ALJ") on January 18, 2005. (Tr. 48) A hearing before ALJ Paul Armstrong was held on January 10, 2006, at which vocational expert Lee O. Knutson and Medical Expert Dr. William Newman testified. (Tr. 382)  On March 15, 2006, the ALJ denied Eason's application by written decision. (Tr. 14) Following a

denial of his request for review by the Appeals Council on August 4, 2006, Eason filed a complaint in this court on October 30, 2006. (Tr. 3)

Eason was born on June 2, 1958, and was 47 years old at the time of the hearing before the ALJ. (Tr. 367) At the hearing, Eason indicated that in 1977 he suffered a gun shot wound in the abdomen, that the bullet remained lodged in him, and that he required surgery to his right knee as the result of a motor vehicle accident in 1992. (Tr. 388, 115)

Eason's claims for disability and supplemental income largely revolve around an assault that he suffered in July 2002. According to an "EMS Run Sheet" completed by a member of the Gary, Indiana Fire Department, Eason was found on July 16, 2002, with scalp lacerations and facial deformities following an assault by "several persons." (Tr. 277) From July 16 to 19, Eason was treated at Methodist Hospital in Gary. He was diagnosed as suffering a comminuted fracture of the nasal bones, and though he complained of blurred vision, the initial diagnoses included no orbital fractures. (Tr. 283) Dr. Neil Watkins examined Eason during his initial stay at Methodist and concluded that Eason had subconjunctival hemorrhages, periorbital and periocular contusions, facial abrasions, and nasal fractures. (Tr. 284) A second consultative exam by Dr. J. Jones on July 19 indicated nasal and orbital fractures, and Dr. Jones recommended surgery to "repair nasal fracture with exploration of orbital fractures." (Tr. 286) Dr. Jones performed this surgery on July 26, confirming a "very

mild blowout fracture" to the orbital floor. (Tr. 188)

On June 23, 2003, Eason's treating physician, Dr. Adolphus Anekwe, completed a physical assessment of ability to do work-related activities. (Tr. 150-153) In this report, Dr. Anekwe indicated that Eason was able to lift no more than five to ten pounds, was able to stand or walk for no more than an hour total and no more than 30 minutes without interruption, and appeared to have debilitating restrictions to his ability to perform daily activities. (Tr. 150-151) Regarding each of these restrictions, Dr. Anekwe indicated that the medical findings on which he based his conclusion were the "history given by the patient." (Tr. 151) He also noted that Eason's balance was affected by his injuries and that he required a cane. (Tr. 152) In the report, Dr. Anekwe concluded that the combined effects of Eason's impairments "make it impossible for the patient to do even menial duty or perform minimal tasks." (Tr. 152)

Following orders for lab work that included tests for hypothyroidism, lipid levels, and a separate order with the handwritten indication "DT Anemia," Eason underwent a CT scan based on complaints of right hip pain. (Tr. 159-160, 155) The record contained no results from this test. (Tr. 155)

In a disability report completed with his initial application for benefits, Eason made reference to "back and head problems" and "loss of feeling in arm and legs." (Tr. 81-90) Eason also indicated that he experienced numbness, daily back pain, and headaches. (Tr. 111) He further stated that he could walk only

3

three blocks and no longer was able to fish, bike, or do yard work. (Tr. 111)

On March 25, 2004, Dr. Anekwe indicated that Eason experienced minimal decrease to the range of motion of his cervical spine and 10 to 20 degree decrease to the range of motion of his lumbar spine, noting also the experience of pain when moving. (Tr. 112) He indicated decreased reflex in both legs but no muscle weakness or atrophy. (Tr. 112) Dr. Anekwe stated that Eason experienced lower leg pain on standing or sitting for too long and that the pain could be relieved by lying down completely for 15 to 20 minutes. (Tr. 113) Dr. Anekwe noted pain in the thigh and lower back in response to straight leg raises but no loss of grip strength or ability to perform fine and gross motor manipulation. (Tr. 113)

An x-ray of Eason's spine on April 16, 2004, revealed "mild bone spurring at the level 4 vertabrial body" and mild degeneration at the C5-S1 level. (Tr. 115) On that same day, Dr. M. Zeitoun performed a consultative exam at which Eason indicated lower back and shoulder pain and numbness in his legs, which Eason attributed to the bullet fragments in his back. (Tr. 116) He also told Dr. Zeitoun that if he was on his feet for an extended period, his legs would give out and that he suffered from dizziness. (Tr. 116) The exam indicated little that was outside of normal limits with the exception of slowness in movement due to low back pain, particularly tenderness at L1-L5 and C2-C7 (Tr. 118)

In a disability report that accompanied his July 2004 request for reconsideration, Eason reported increased right shoulder pain and muscle spasms. (Tr. 93) He stated that his difficulty maintaining his balance "interferes with everything." (Tr. 95) In addition, in a similar report completed about a month later, Eason also noted the use of Xanax for his nerves. (Tr. 100)

On October 7, 2004, Dr. Phillip S. Budzenski examined Eason on behalf of the Indiana Disability Determination Division. (Tr. 125-130) Eason reported that he did not suffer upper or lower extremity symptoms from his past gun shot wound, car accident, or the July 2002 assault. (Tr. 125) Dr. Budzenski noted that Eason walked with a normal gait, appeared comfortable in a seated or supine position, and got on and off the exam table without difficulty. (Tr. 126) He further reported that the cervical and dorsolumbar spine exam revealed no tenderness or paravertebratal muscle spasm. (Tr. 126) Dr. Budzenski reached similar conclusions regarding Eason's shoulders and knees. (Tr. 127, 128) Finally, Dr. Budzenski found no neurological conditions outside the normal limits and concluded that there were "no physical findings that would limit the claimant's ability to perform work-related functions." (Tr. 129)

On October 12, 2004, Eason also underwent a psychiatric consultative exam with Dr. Jeffrey Karr. At this exam, Eason indicated that he continued to experience residual physical effects from the July 2002 assault, including head, neck, and shoulder

5

pain. (Tr. 131, 133) Eason also stated that since the attack, he suffered a diminished appetite, inability to sleep, constant fearfulness, and anxiety. (Tr. 132) However, in his report, Dr. Karr indicated "no overt indication of anxiety" and otherwise noted behavior within normal limits. (Tr. 132) Dr. Karr concluded with a diagnosis of post traumatic stress disorder "per history." (Tr. 133) A psychiatric review completed by Dr. J. Gange on November 19, 2004, described only mild limitations in maintaining social function but found Eason's psychological condition otherwise normal. (Tr. 135-148)

Eason arrived at the hearing before ALJ Armstrong with his arm in a sling and indicated that because of the July 2002 assault, his arm became numb if it was not in the sling. (Tr. 387) The ALJ questioned Eason regarding the activities, including biking and fishing, that he no longer engaged in since the assault. (Tr. 388) Eason noted that he engaged in these activities before the assault and after his knee injury in 1992, but he stated that the assault aggravated the knee injury and prevented him from engaging in these activities. (Tr. 388) The ALJ also questioned Eason on his past employment and noted that Eason had not "made much money since 1995." (Tr. 390) The ALJ stated "somebody that doesn't work much before they're injured and they don't work much after they're injured, then I don't see any difference." (Tr. 390)

Eason described his experience of anxiety and trouble sleeping, noting that he had been taking Ambien to help him sleep and

6

continued taking Xanax "for his nerves." (Tr. 392) He stated that he experienced lower back pain and believed that its cause might be the bullet that remained lodged in him. (Tr. 394) He felt he could walk, at most, four or five blocks before experiencing back pain but noted that he no longer experienced problems with his neck. (Tr. 394-395) He engaged in no daily activities with the exception of reading and watching television. (Tr. 397-398)

Eason also stated that he had been advised to have surgery on his shoulder and to remove the bullet but was unable to do so because of the expense. (Tr. 397) He testified that he took three Vicodin daily to address pain and that his shoulder and arm numbness were what "really bothers him the most." (Tr. 402) Eason believed the assault caused the bullet to become dislodged, accounting for the increase in back pain following the attack. (Tr. 404)  Eason stated that this caused his back pain to increase if he stood or sat for too long, and the pain could be relieved only by reclining. (Tr. 404)

Eason characterized his emotional problems since the attack as no longer being sure "who to trust," not being comfortable around people, and being at peace only when at home. (Tr. 407) Dr. William Newman, the medical expert, testified that he "didn't see much of anything" in the record, stating, "I see a little disc degeneration at L-5." (Tr. 409)

The ALJ presented a hypothetical to Lee Knutson, the vocational expert, based on an individual limited to light exertional duties with no overhead work with the right hand dominant. (Tr.

7

425) The ALJ further limited the hypothetical based upon the side effects of Vicodin to no work at unprotected heights, around dangerous moving machinery, open flames, or bodies of water. (Tr. 425) Finally, "because of his alleged post-traumatic stress problem, no more than superficial contact with supervisor, co-employees and the general public." (Tr. 425) The VE responded that the region contained over 100,000 jobs in light production assembly, cashier, or rental clerk positions. (Tr. 426) When the hypothetical was modified to reflect right hand numbness, only the approximately 20,000 light assembly jobs were eliminated. (Tr. 426) Finally, if the experience of pain and side effects of medications prevented the individual from staying on task for more than 15 minutes of every hour, or required him to miss more than two work days per month, or caused him to lie down for an hour during the day, no jobs would be available. (Tr. 427, 429)

In his decision denying benefits, the ALJ examined Eason's rotator cuff injury, degenerative disc condition, anxiety, depression, and the residuals of the facial injuries suffered in the assault. (Tr. 16) The ALJ found that Eason's statements concerning the degree of his impairments "not entirely credible." (Tr. 19) The ALJ found it reasonable that Eason's back condition precluded heavy lifting, but he stated that an RFC for light exertional work was supported by Eason's claim to have walked the "several blocks" to one of his exams. (Tr. 19) Likewise, the ALJ found Eason's claim to suffer from headaches reasonable in light

8

of his injuries, but the alleged extent was not supported by the record. (Tr. 19)

The ALJ also discounted Dr. Anekwe's conclusions that Eason was unable to do any work as based on the "claimant's own history/opinion." (Tr. 19) The ALJ noted that the "state agency opinion is at the opposite end of the spectrum" and that Dr. William Newman, the medical expert, testified that Eason did not suffer from any severe impairment. (Tr. 19-20) The ALJ concluded that Eason was not capable of performing his past relevant work as a landscaper or floor cleaner. (Tr. 20) Based upon the testimony of the vocational expert, the ALJ concluded that Eason was capable of performing work as a production assembler, cashier, or sales attendant. (Tr. 21)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."). **Schmidt v. Barnhart**, 395 F.3d 737, 744 (7th Cir. 2005); **Lopez ex rel Lopez v. Barnhart**, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." **Richardson v. Perales**, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting* **Consolidated Edison Company v. NLRB**,

9

305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). See also *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.
>
> 42 U.S.C. §423(d)(1)(A)

The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. §404.1520. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §404.1520(b). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical

10

or mental ability to do basic work activities." 20 C.F.R. §404.1520(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. §401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. 20 C.F.R. §404.1520(e). However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f).

Eason first claims that the ALJ erred in granting his testimony only partial credibility. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's

11

"unique position to observe a witness" entitles his opinion to great deference. ***Nelson v. Apfel***, 131 F.3d 1228, 1237 (7th Cir. 1997); ***Allord v. Barnhart***, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. ***Steele v. Barnhart***, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." ***Clifford v. Apfel***, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a); ***Arnold v. Barnhart***, 473 F.3d 816, 823 (7th Cir. 2007)("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); ***Scheck v. Barnhart***, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physi-

12

cian or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]."  20 C.F.R. §404.1529(c); **Schmidt,** 395 F.3d at 746-47 ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence."  SSR 96-7p, at *1.  *See also* **Indoranto v. Barnhart**, 374 F.3d 470, 474 (7th Cir. 2004); **Carradine v. Barnhart**, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits.").  Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claiming.  She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties.  Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and

13

>    the claimant's daily activities. (internal
>    citations omitted)
>
>    *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.
>    1994)

*See also* ***Zurawski v. Halter***, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, he must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, at *2.  *See* ***Zurawski***, 245 F.3d at 887; ***Diaz v. Chater***, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence).  He must "build an accurate and logical bridge from the evidence to [his] conclusion." ***Zurawski***, 245 F.3d at 887 (*quoting* ***Clifford***, 227 F.3d at 872). When the evidence conflicts regarding the extent of the claimant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting.  *See* ***Zurawski***, 245 F.3d at 888 (*quoting* ***Bauzo v. Bowen***, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of

14

the substantiality of evidence takes into account whatever in the record fairly detracts from its weight."). (emphasis in original)

Eason's primary argument is that the ALJ's sole basis for discounting his credibility was the statement made by the consultative psychological examiner, Dr. Karr, that Eason "hesitantly walked to today's exam which was only a few blocks from where he lived." (Tr. 131) This statement was not made in the context of an examiner's assessment of Eason's physical ability to walk certain distances but instead was a comment on Eason's emotional reluctance to leave his residence. Further, though the ALJ characterized the distance as "several blocks," in fact, Dr. Karr referred to "a few blocks." However, Eason is incorrect when he stated that the ALJ cited to no other evidence to support his conclusion. The ALJ also referred to the exam by Dr. Budzenski, spine and cervical x-rays that were taken in April 2004, the exam by Dr. Zeitoun, and the testimony of medical expert Dr. Newman.

Eason's April 2004 x-ray showed only mild bone spurring and degeneration. Dr. Zeitoun, who noted Eason's "slow gait due to back pain," also stated that Eason walked, stooped, squatted, and got on and off the exam table with no more than mild difficulty. Similarly, Dr. Budzenski's October 2004 exam noted Eason's back complaints and the indications of back problems, but he still concluded that there were "no physical findings that would limit the claimant's ability to perform work-related functions." (Tr. 129) The ALJ, who rejected Dr. Budzenski's conclusion that

15

Eason's capability for work was unlimited, sufficiently supported his conclusion that Eason was capable of light exertional work.

Eason also argues that the ALJ improperly credited the opinions of non-treating physicians over the report of his treating physician, Dr. Anekwe. A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. §404.1527(d)(2). *See also* **Schmidt**, 496 F.3d at 842; **Gudgell v. Barnhart**, 345 F.3d 467, 470 (7th Cir. 2003).  The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." **Clifford**, 227 F.3d at 870 *(quoting* **Scivally v. Sullivan**, 966 F.2d 1070, 1076 (7th Cir. 1992)). *See also* 20 C.F.R. §404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Internal inconsistencies in a treating physician's opinion may provide a good reason to deny it controlling weight. 20 C.F.R. §404.1527(c)(2); **Clifford**, 227 F.3d at 871. Furthermore, controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony. **Schmidt**, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsis-

16

tent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."). *See e.g.* **Latkowski v. Barnhart**, 93 Fed. Appx. 963, 970-71 (7th Cir. 2004); **Jacoby v. Barnhart**, 93 Fed. Appx. 939, 942 (7th Cir. 2004). Ultimately, the weight accorded a treating physician's opinion must weigh all the circumstances with the recognition that, while a treating physician "has spent more time with the claimant," the treating physician also may "bend over backwards to assist a patient in obtaining benefits . . . [and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." **Hofslien v. Barnhart**, 439 F.3d 375, 377 (7th Cir. 2006). (internal citations omitted)

Eason argues that Dr. Anekwe's opinion is entitled to "conclusive" weight, but he does not address the existence of significant instances of inconsistencies between Dr. Anekwe's conclusions and the evidence described above. Dr. Anekwe's June 2003 report further does not appear to be "supported by medical findings." Instead, he appears to have completed the form in reliance on nothing more than "history given by the patient." Accordingly, neither characteristic entitling a treating physician's opinion to controlling weight - supported by medical evidence and consistent with other evidence - is present here.

In addition, Eason also argues that the ALJ did not assess properly his complaints of persistent headaches and dizziness,

17

which the ALJ acknowledged but stated were unsupported by clinical findings. Eason does not point to medical evidence in support but instead notes that he made complaints of headaches and dizziness to both Dr. Zeitoun and Dr. Karr. However, Eason's act of reporting a complaint is not the equivalent of medical evidence. *See* 20 C.F.R. §404.1513. Further, the ALJ accounted for these conditions in the RFC determination and in the hypotheticals presented to the VE. (Tr. 18, 425-426) There is no indication that the limits reflected in the ALJ's RFC determination fail to account for the headaches and dizziness that Eason encounters.

Eason argues that the RFC determination includes additional flaws, including the failure to account for limits in Eason's fine finger manipulation ability and his inability to stand more than one hour. Eason's support for these objections is based on Dr. Anekwe's report and fails to account for Dr. Anekwe's other report that concluded Eason had lost no grip strength and maintained a "fair to good" ability to perform fine and gross motor movements. (Tr. 113, 151)  Consequently, the arguments made here are virtually the same arguments made, and rejected above, in the context of the ALJ's ability to discredit a treating physician's opinion. The ALJ properly discounted this report and Eason offers no other evidence in support of a different RFC.

Finally, Eason argues that the ALJ's reliance on cashier and sales attendant jobs is inconsistent with his finding that Eason should be limited to no more than superficial contact with the

18

public. According to Eason, common sense dictates that a job which requires frequent communication cannot be considered to be superficial contact. There is no reason to assume, as Eason does, that *superficial* must be synonymous with *infrequent*. Rather, common sense suggests that the contact between a cashier and customer clearly is superficial. In addition, the ALJ also found that Eason was capable of performing 20,000 production assembler positions. Accordingly, even if the ALJ erred on this point, the step five determination is not altered. *See* **Hilmes v. Barnhart**, 118 Fed. Appx. 56, 60 (7th Cir. 2004)(*quoting* **Fisher v. Bowen**, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires [this court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). Eason did note, in his reply, that the assembler position includes being "a member of [an] assembly group." His assumption regarding this detail is that membership in a group must entail some degree of communication. As in the cashier example, there is no indication that this communication reaches beyond the superficial. Eason's argument stretches the ALJ's conclusion from a limit of no more than superficial contact, to an absolute bar of any contact. This is inaccurate.

_____

For the foregoing reasons, pursuant to Sentence Four of 42 U.S.C. §405(g), the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to close this case.

19

ENTERED this 25th day of January, 2008

                                                s/ ANDREW P. RODOVICH
                                                   United States Magistrate Judge